## PENNSYLVANIA R. CO. v. SWIFT & CO.

(Circuit Court of Appeals, Third Circuit.   July 1, 1919.)

No. 2368.

1. CARRIERS ⬅⮕211—LIVE STOCK—FEEDING—INTERSTATE SHIPMENT—LIABILITY FOR FEEDING.

Act Cong. June 29, 1906 (Comp. St. §§ 8651–8654), "to prevent cruelty to animals in transit," does not contemplate a divided, dual duty, but a single, unitary one to feed and water cattle in interstate transit, and the shipper may not escape liability for a part of the feed so furnished by the carrier under government inspection, because shipper placed a part of the required feed in the car without such inspection, prior to shipping.

2. CARRIERS ⬅⮕211—INTERSTATE SHIPMENT OF LIVE STOCK—FEEDING.

A carrier cannot recover from shipper the price of feed placed in the cars by virtue of the provisions of Act Cong. June 29, 1906 (Comp. St. §§ 8651–8654), requiring feeding in transit.

3. CARRIERS ⬅⮕211—LIVE STOCK—FEEDING IN INTERSTATE TRANSIT—CONTRACT—IMPLIED FROM CUSTOM—PLEADING.

A carrier cannot recover from shipper the price of feed furnished and placed in cars upon an implied contract from acquiescence in such practice, where no claim of implied contract was asserted in the statement of claim filed or submitted to the jury and not pleaded, although there was sufficient evidence to warrant the issue.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by the Pennsylvania Railroad Company against Swift & Co.   Judgment for plaintiff, and defendant brings error.   Judgment reversed, and cause remanded.

R. D. Rynder, of Chicago, Ill., and M. Hampton Todd, of Philadelphia, Pa., for plaintiff in error.

John Hampton Barnes, of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and HAIGHT, District Judge.

BUFFINGTON, Circuit Judge.   In the court below the Pennsylvania Railroad Company sued Swift & Co., the owner and shipper of certain cattle, for food furnished said cattle at the stockyards in Pittsburgh while in interstate transportation.   The cattle were received by the railroad at Chicago.   At the end of a 28-hour run they reached Pittsburgh.   Swift & Co., who were large shippers, had made no provision for feeding and resting their cattle at Pittsburgh.   That duty, under the statute hereafter quoted, fell on the railroad, and it had provided proper pens in the stockyards at Pittsburgh for thus feeding, watering, and resting the cattle.   Into this same yard came trains of cattle which had carried cattle for 28 hours from Chicago without being unloaded.   There came also other trains of cattle which had been rested and fed at Crestline, Ohio, and which had been but 15 hours in transit without feeding.   As both the 15-hour and the

28-hour cattle were unloaded at any of the Pittsburgh pens indifferently, and as a larger feed had to be given the 28-hour cattle, the railroad, in order to better handle the feeding, unloading, and reloading of the cattle, placed in the feeding racks of the pens, in advance of the arrival of all cattle, 150 pounds of feed. In the case of the Crestline, or 15-hour, cattle, this was all they got at Pittsburgh. But in the case of the Chicago, or 28-hour, cattle, the railroad furnished at Pittsburgh an additional 100 pounds of feed. If this extra 100 pounds were placed in the racks of the resting pens, it would have occasioned great delay and inconvenience, because in that case the Crestline cattle would have to be kept out of the pens where this extra 100 pounds was placed for the Chicago cattle. The railroad company, therefore, instead of placing such extra 100 pounds in the racks of the resting place, placed it in the standing cars, where the Chicago cattle would eat it after they left the pens. In this way, the cattle had more time for rest in the pens, the railroad could better and more expeditiously handle the traffic, and the cattle had some food to eat in transit if they so desired. The government had its inspectors at Pittsburgh, to see that this humane statute was duly observed.

Before Swift & Co. shipped their cattle at Chicago, they placed 150 pounds feed for each animal in the cars, and, regarding such 150 pounds as a partial feeding of the 250 pounds, which all parties concede is a proper feeding for a 28-hour run, Swift & Co. notified the railroad company to feed only 100 pounds to the cattle in the Pittsburgh rest pens. Their contention was that the 150 pounds they themselves placed in the cars in Chicago and the 100 pounds placed by the railroad company in the pens at Pittsburgh under their order constituted the proper feeding of 250 pounds, which, as we said, all parties agree was the proper amount to be fed during or at the end of a 28-hour run. For this extra 100 pounds thus fed by the railroad company, Swift & Co. paid the railroad. The railroad company, on its part and as it appears in accordance with the requirements of the government inspectors at Pittsburgh, contended that, the duty of feeding the cattle during the entire trip not having been assumed by Swift & Co., said duty could not be divided, and that the entire duty was imposed on them, viz. to furnish the proper 250 pounds of feed to the cattle when they came to Pittsburgh. The railroad, therefore, instead of restricting itself to the 100 pounds of feed which Swift & Co. desired fed at Pittsburgh, fed 150 pounds additional, 50 pounds of which, in addition to the 100 pounds desired by Swift & Co., they placed in the pens, and the other 100 pounds of which they placed in the standing cars. Swift & Co. paid for 100 pounds of the 150 pounds placed in the pens, and denied their liability to pay the additional 50 pounds placed in the pens. For this 50 pounds, which we will call the "contested pen feed," the railroad brought this suit, and for the 100 pounds placed by the railroad in the cars, and which we will call the "contested car feed," the railroad also brought suit. Having recovered judgment for both these items in the court below, Swift & Co. sued out this writ of

error, and the fundamental question involved is the construction of Act Cong. June 29, 1906, c. 3594, 34 Stat. 607 (Comp. St. §§ 8651–8654), entitled "An act to prevent cruelty to animals while in transit." So far as pertinent to the present case, that act provides:

"That no railroad * * * transporting cattle * * * through another state * * * shall confine the same in cars * * * for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours."

It further enacts:

"The animals so unloaded shall be properly fed and watered during such rest either by the owner or person having custody thereof, or in case of his default in so doing, then by the railroad, * * * at the reasonable expense of the owner; * * * but nothing in this section shall be construed to prevent the owner or shipper of animals from furnishing food therefor, if he so desires."

There is a radical difference between Swift & Co. and the Department of Agriculture as to the proper construction of the statute, and therefore as to the proper performance of the statutory duty of feeding, but when their differences are analyzed it is clear that both Swift & Co. and the Agricultural Department are in substantial accord that the proper amount of feed for a 28-hour transit is 250 pounds, and it is on that theory that Swift & Co. had fed 150 pounds when they shipped the cattle at Chicago and directed the railroad to feed the 100 pounds additional at Pittsburgh. Where they differ in the construction and application of the statute is as to when, where, and by whom the 250 pounds should be fed to the cattle. It will thus be seen that the question in issue is really a test one between the shippers of cattle and the Department of Agriculture, and that the railroad's only course was to comply with whatever the law meant and its proper application.

[1] After careful consideration, we are of opinion the construction of the law contended for by the government is the proper one. The law gives the owner and shipper of cattle the option of performing the statutory duty of feeding his cattle in transit, but if he does not assume that statutory duty the act compels the railroad to perform it. Manifestly, the statute does not contemplate a divided, dual duty, but a single, unitary one, which the owner primarily has the right to perform; or, if he does not assume the duty, the railroad must. To hold the duty was a divisible one would result, not only in neglect of the cattle, but in the absence of that governmental inspection of the cattle in transit, which safeguards them from unnecessary suffering. From this it follows that if the duty is a unitary one, if the shipper does not assume that duty in its entirety, and if it is cast on the railroad, the shipper cannot hamper the railroad with conditions, or by any voluntary part performance on its part add to or detract from the railroad's obligation to perform the statutory duty in its entirety. Now, the statute compels the railroad, after a transit of 28 hours, to unload the cattle "in a humane manner, into properly equipped pens for rest, water, and feeding, for * * * at least five consecutive

hours," and that "the animals so unloaded shall be properly fed and watered during such rest." In carrying out that statutory requirement, the railroad has provided at Pittsburgh, at the terminus of a run which is approximately 28 hours from the great cattle shipping point of Chicago, suitable pens, with facilities for rest, water, and feed. The government has its inspectors at Pittsburgh, to see that the provisions of the law are complied with, and, as we have noted, the unquestioned fact is that a 250-pound feed given at Pittsburgh would comply with the statute and fit the cattle for the next long-hour run of the journey east. The railroad having thus provided water, food, and rest facilities at Pittsburgh, and the proper amount of food for the cattle at that point being 250 pounds, and the cattle owner not having exercised his primary right of assuming the duty in its entirety, it inevitably follows, in our judgment, that no voluntary act of the shipper in partially feeding, without governmental inspection, the cattle at other times and places can lessen the duty of the railroad to provide proper food at the rest pens at the end of the 28-hour transit. It follows, therefore, that when Swift & Co., who had volunteered to place 150 pounds of food in the cars before the cattle started from Chicago, sought to prevent the railroad from furnishing more than 100 pounds of food to the cattle at the end of the 28-hour run in Pittsburgh, this was an unwarranted effort to prevent the railroad from performing its full statutory unitary duty at Pittsburgh. Such being the case, it follows, therefore, in so far as the item of "contested pen feed" is concerned, namely, the 50 pounds additional which the railroad sought to recover, it was clearly entitled to recover, and to that extent the verdict and judgment of the court below was justified.

[2, 3] Turning next to the item of "contested car feed," it is quite clear to us that, if such 100 pounds of extra food could have been and had been placed in the pens and there fed to the cattle, the railroad company would have been entitled to recover therefor. But, in point of fact, it did not place it in the pens, but placed it in the cars, where the animals could get it after leaving the pens. Counsel for the railroad now concede at bar that the placing of this food in the cars was not justified by the statute, but assert that the railroad is entitled to recover the price of the food thus furnished, because of an implied contract of Swift & Co. to pay for it, which it alleges arose from its acquiescence in that practice. In other words, they claim the right of recovery upon an implied contract, and they contend that the existence of such a contract was submitted to the jury and determined in the railroad's favor. Had such been the case, this judgment would have been justified in its entirety, but, unfortunately for the contention of the railroad, this cannot be done, for two reasons: First, no claim on such an implied contract is asserted in the statement of claim filed; and, second, the question of the existence of such a contract was not submitted by the court to the jury. As to the first point, the statement of claim is based wholly on the right of the railroad to recover this "contested car feed" item as a performance of a statutory duty, and there is no reference whatever to any implied

contract arising from the acquiescence of Swift & Co. Therefore under the pleadings that fact was not in issue. As to the contention that such unpleaded issue was submitted to the jury and found in the defendant's favor, an inspection of the charge shows that this is not the case. It is true it was assumed by the court in its charge that there was such a contract, and virtually the jury was directed so to find; but, in point of fact, that issue was not submitted, and therefore such issue cannot be taken as a fact determined by the jury's verdict. It follows, therefore, that this portion of the verdict cannot be sustained. We deem it proper, however, to say that, in view of the fact that there was evidence on that subject which would have warranted the submission of that issue to the jury had it been raised by the pleadings, and as the case must go back for retrial, we see no objections to the railroad company, by proper amendment, asserting such grounds of recovery and raising this question, so that the liability of Swift & Co. on this implied contract, arising from acquiescence, may be determined. We also deem it proper to say we find no error in the court's admission in evidence of the departmental circular concerning proper feeding, and, moreover, there was really no dispute in the case but that 250 pounds was a proper feeding for a 28-hour run.

The judgment below is reversed, and the case remanded for further proceedings in accord with this opinion.