**PENNSYLVANIA R. CO. v. SWIFT & CO.**

(Circuit Court of Appeals, Third Circuit.. February 14, 1925.)

No. 3165.

Carriers ⬤=211—Carrier held not entitled to recover from owner of cattle for feed placed in cars.

Under statutes requiring unloading of cattle for rest, and feeding while so unloaded at owner's "reasonable expense," carrier, in absence of agreement, cannot recover from owner for feed placed in cars after cattle were reloaded.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Charles L. McKeehan, Judge.

Action by the Pennsylvania Railroad Company against Swift & Co. Judgment for defendant, and plaintiff brings error. Affirmed.

See, also, 242 F. 92; 248 F. 315; 258 F. 289, 169 C. C. A. 305.

John Hampton Barnes, of Philadelphia, Pa., for plaintiff in error.

R. D. Rynder, of Chicago, Ill., and M. Hampton Todd, of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. On the trial of this case the court below gave binding instructions in favor of the defendant. Its action in so doing is here assigned for error, and raises the sole question involved. The nature of the case and the facts pertinent thereto are fully set forth in the opinion of this court at 258 F. 290, 169 C. C. A. 305, when the case was heretofore before us. We save needless present repetition by reference thereto.

From an examination of the part of that opinion printed in the margin,[1] and the

[1] "In the court below the Pennsylvania Railroad Company sued Swift & Co., the owner and shipper of certain cattle, for food furnished said cattle at the stockyards in Pittsburgh while in interstate transportation. The cattle were received by the railroad at Chicago. At the end of a 28-hour run they reached Pittsburgh. Swift & Co., who were large shippers, had made no provision for feeding and resting their cattle at Pittsburgh. That duty, under the statute hereafter quoted, fell on the railroad, and it had provided proper pens in the stockyards at Pittsburgh for thus feeding, watering, and resting the cattle. Into this same yard came trains of cattle which had carried cattle for 28 hours from Chicago without being unloaded. There came also other trains of cattle, which had been rested and fed at Crestline, Ohio, and which had been but 15 hours in transit without feeding. As both the 15-hour and the 28-hour cattle were unloaded at any of the Pittsburgh pens indifferently, and as a larger feed had to be given the 28-hour cattle, the railroad, in order to better handle the feeding, unloading, and reloading of the cattle, placed in the feeding racks of the pens, in advance of the arrival of all cattle, 150 pounds of feed. In the case of the Crestline, or 15-hour, cattle, this was all they got at Pittsburgh. But in the case of the Chicago, or 28-hour, cattle, the railroad furnished at Pittsburgh an additional 100 pounds of feed. If this extra 100 pounds were placed in the racks of the resting pens, it would have occasioned great delay and inconvenience, because in that case the Crestline cattle would have to be kept out of the pens where this extra 100 pounds was placed for the Chicago cattle. The railroad company, therefore, instead of placing such extra 100 pounds in the racks of the resting place, placed it in the standing cars, where the Chicago cattle would eat it after they left the pens. In this way, the cattle had more time for rest in the pens, the railroad could better and more expeditiously handle the traffic, and the cattle had some food to eat in trans-

pleadings of the case, it will be seen that of the 250 pounds of hay fed by the Pennsylvania Railroad to Swift & Co.'s cattle at Pittsburgh, the latter voluntarily paid for 100 pounds. They also paid for 50 pounds additional as a result of the judgment and its affirmation by this court in the opinion referred to. This 150 pounds covered all the hay fed in the pens. After that opinion was filed, the railroad amended its pleading, alleging Swift & Co. had agreed to pay also for the 100 pounds of hay the railroad had placed in the cars as they were leaving Pittsburgh, under the circumstances and for the reasons set forth in the excerpt of the opinion in the margin.

There had been, and was at the time of the feeding here in controversy, a dispute between Swift & Co. and the government bureau, as to the proper feeding of their cattle in transit. The railroad had no part, interest, or volition in that dispute; its duty as a common carrier forced it to act; meanwhile it had to transport the cattle, and in doing so, to comply with the directions of the bureau as to feeding, or subject itself to threatened prosecution and the consequent imputation that it was starving cattle in transit. The outcome of the dispute shows that Swift & Co. were wrong in their construction of the law, and that the 100 pounds of hay they would have allowed to be fed at Pittsburgh was but a little over one-third of what it is now adjudged was a proper feeding at Pittsburgh for cattle in transit 28 hours. But the outcome also shows the railroad was mistaken in its course, in that it had no statutory right to feed any of the hay at Pittsburgh, elsewhere than in the pens.

The statute (Comp. St. §§ 8651, 8652) printed in the margin,[2] provides, in the case of 28-hour cattle, for "unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding. * * * Animals so unloaded shall be properly fed and watered during such rest, either by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad * * * at the reasonable expense of the owner."

Had the railroad placed the 100 pounds here in question in the pen racks, they would have complied literally with the statute and could have recovered therefor. But, instead of doing so, they, as the cattle were leaving Pittsburgh, after the 5-hour rest, put in the pen racks of the outgoing cars the 100 pounds here in controversy. Under such circumstances, the railroad could not recover therefor as an obligation imposed by the statutory provision "at the reasonable expense of the owner," for the literalism of the statute only provided for the cattle being in "properly equipped pens for rest, water, and feeding," and that "the animals so unloaded shall be properly fed and watered during such rest." Consequently, although the railroad complied with the spirit of the statute, and gave Swift's cattle the lawful 250 pounds of food at Pittsburgh, yet, as the last 100 pounds were placed in the feed racks of the outgoing cars, and not in the pen racks, and in view of the fact that Swift & Co. were protesting against the cattle being fed this 100 pounds and the other 50 pounds of contested feed, the railroad was bound to show an agreement on the part of Swift & Co. to pay for this 100 pounds which were fed otherwise than the statute provided.

We have carefully examined the proofs, which are now before us in their entirety, and we are unable to see how the minds of these parties ever met in an agreement that Swift & Co. should pay for this car-fed feed.

The judgment below is therefore affirmed.

---

it if they so desired. The government had its inspectors at Pittsburgh, to see that this humane statute was duly observed.

"Before Swift & Co. shipped their cattle at Chicago, they placed 150 pounds feed for each animal in the cars, and, regarding such 150 pounds as a partial feeding of the 250 pounds, which all parties concede is a proper feeding for a 28-hour run, Swift & Co. notified the railroad company to feed only 100 pounds to the cattle in the Pittsburgh rest pens. Their contention was that the 150 pounds they themselves placed in the cars in Chicago and the 100 pounds placed by the railroad company in the pens at Pittsburgh under their order constituted the proper feeding of 250 pounds, which, as we have said, all parties agree was the proper amount to be fed during or at the end of a 28-hour run."

[2] "That no railroad * * * transporting cattle * * * through another state * * *

shall confine the same in cars * * * for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours. * * *

"The animals so unloaded shall be properly fed and watered during such rest either by the owner or person having custody thereof, or in case of his default in so doing, then by the railroad, * * * at the reasonable expense of the owner; * * * but nothing in this section shall be construed to prevent the owner or shipper of animals from furnishing food therefor, if he so desires."